Good morning. Good morning. Before you, you have the 1st District, 2nd Division Appellate Court, meaning Justice Terry Lavin, Mary Ellen Coughlin, and myself, Justice James Fitzgerald Smith. Our case today is People v. Kirsten-17-2058. The following order and procedures are as follows. First, the appellant will present their case with no interruptions from us for 10-12 minutes. Then the justices will ask questions. Then the appellee will do the same, present their case. Then the justices will ask their questions. And finally, then the appellant will close to the 3-5 minutes. You may introduce yourselves and then we'll begin. Good morning. Stephen Gentry representing Joseph Kestian. How do you pronounce the name? Is it Kestian? I've been pronouncing it Kestian. Kestian. Okay. All right. That's a good question. Kestian. All right. Good morning. My name is Paul Wosicki on behalf of the people of the state of Illinois. Great. All right. You may proceed. Thank you. This court should reverse Joseph Kestian's first-degree murder conviction because the state's evidence, which it concedes was entirely circumstantial, failed to preclude the reasonable possibility that someone else committed the crime. The only evidence connecting Joseph to the murder was his presence in the home where he lived in an attic living space at the time his 90-year-old mother, Josephine, was murdered on the first floor. Significantly, the state's evidence showed no motive. The state argues that a reasonable inference can be drawn that the house, and particularly the front door, was locked prior to the crime, and therefore Joseph was the only person with the opportunity to have committed the murder. However, there is no factual basis for such an inference. The state introduced no evidence that the door was locked prior to the murder or at any time prior to the arrival of the first responders who were met at the door by Joseph, who had just called 911 to request their assistance. The state claims that Joseph's statement in the 911 call, that he would open the door for the paramedics, is proof that prior to calling 911, Joseph had checked the front door to see if it was locked and determined that it was locked and that he would therefore need to unlock it to let the paramedics in, but didn't do so at that time, and decided to do so later upon their arrival. This argument asks this court to substitute pure speculation for actual evidence. Joseph's statement to the 911 operator merely reflected his intention to assist the paramedics in facilitating the help he was requesting. The state's claim, rooted in speculation rather than evidence, that the front door was locked prior to the murder, is the only basis for the state's assertion that no one but Joseph had the opportunity to commit this horrible crime. Even so, the state's evidence at trial failed to rebut Joseph's testimony that there was also a spare key kept outside behind the house. The state's evidence did show that Joseph's brother, Anthony, had a key to the house as well. The state's evidence further failed to prove the possibility that Josephine let her killer into the house herself. It is thus irrelevant that there were no signs of forced entry. The state's evidence absolutely did not preclude the possibility that someone other than Joseph committed this crime. In the absence of evidence that no one else had the opportunity to commit this offense, the state asserts that Joseph's statement to an officer that he called 911 within approximately 10 minutes is indicative of his guilt. This view of the evidence, however, is not any more reasonable than it is to note that within minutes of finding his elderly mother unresponsive and trying unsuccessfully to help her himself, he then called 911 for assistance. Similarly, the state relies on Joseph's responses to police interrogation, which were not incriminating in substance, but which were in the state's view indicative of callousness towards his mother's death. This view, however, is not any more reasonable than the view that his response to the wills of a man in shock at awakening in the middle of the night, finding his mother's unresponsive body, calling 911 for assistance and then immediately finding himself being treated as the only suspect by responding officers. Joseph's responses to the officer's interrogation are the kinds of statements that this court has previously found do not provide the kind of evidence upon which a conviction may be based to quote people versus duality. So this court reversed a first degree murder conviction based as here on the defendant's presence in the home at the time of the offense, as well as his arguably callous statements given in response to police interrogation regarding the death in that case of the defendant's daughter. The state concedes that it has no evidence of any motive for Joseph to have murdered his 90 year old mother with whom he had lived for decades. Joseph's brother testified for the state because Joseph is helping their mother down the outdoor stairs for a recent visit. The state produced no evidence of any prior acts of violence by Joseph, or of any conflicts between he and his mother. While motive is not an essential element of first degree murder, its materiality and importance has long been recognized in cases, whereas as here, the evidence is entirely circumstantial. In fact, both of the cases cited by the state as examples of murder cases, where the evidence was entirely circumstantial,  in addition to significant other, if still circumstantial, evidence of guilt, far beyond that which is present here. In McVeigh, the first case cited by the state, the defendant had stolen the victim's car and debit card, and the evidence placed the defendant at the victim's home in the hours before the murder, near the separate location where the body was later recovered. There was also evidence that the defendant checked the website of the local paper where the body was found almost daily prior to the discovery of the body. In Tresia, the second case cited by the state, the defendant had accused his girlfriend of having an affair, had previously beaten her on several occasions, and had previously driven her to the home of the victim, and threatened to murder both of them. After the murder, in that case, rather than calling 911, the defendant changed clothes and jumped a fence to get into his own home, before coming out with a bundle of guns and throwing an object into the river. He also asked several people if they had heard of the murder before the body was found. Besides being entirely circumstantial, Joseph's case is nothing like McVeigh or Tresia. There is no motive here at all. I think you're going to have to move along if you want to get to Rule 431 and the rest of your arguments. Your Honor, I only have a couple of, one paragraph on 431. I would just point out though, I will move forward though, Your Honor. But I do want to point out that this case is much more similar to the two cases cited in the defendant's brief, Duoloby and Howard, where this court found that there could have been an unknown intruder who had entered the home, and the state has entirely failed to prove that Joseph was the only person with the opportunity to murder his mother, an act which he had no known motive to commit. And as for the 431B argument, I would simply say that as an alternative to Joseph's argument that the evidence was insufficient to sustain his guilt, the evidence in this case was at least closely balanced. And this court should remand for a new trial because the trial court failed to ensure, by questions allowing for response, that each juror understood and accepted each of the 431B principles, including the requirement that guilt be established by proof beyond a reasonable doubt, which the jury specifically requested a definition while deliberating, but did not receive. Thank you. I would note that, you tell me if I'm wrong, but when you gave the factual background of the case, the one thing that I didn't hear, you said that his mere presence at the scene was the evidence that the jury heard, but it wasn't just his physical presence, it was the way he looked and the fact that he had abrasions and other markings on his body and on his face. He came up with an explanation that he was cleaning gutters and that's how this stuff happened, and maybe he was just scratching his neck, but there was other, that is also circumstantial evidence that he was involved in a struggle, perhaps, with the decedent. Your Honor, it is circumstantial evidence, but it's circumstantial evidence that the state entirely failed to connect to Mr. Kestchen. The fingernails of the victim were bagged by the responding evidence technicians and tested, and there was no DNA coming back to Joseph. And additionally, these markings, as the court can see from looking at the pictures, are not the markings left on a person in a life-and-death struggle, and it's not clear that the victim in this case was really in a position to, she was 90 years old and required the assistance of two walkers, was not in a position to really have put up much of an assistance anyway. So that evidence, while circumstantial, was not tied to Mr. Kestchen. Okay. I have a question with respect to the DNA evidence, counsel. That wasn't, doesn't the record reflect that there was just simply not enough evidence to rule out anybody, rule out or rule in? It wasn't as if your client was excluded, they just didn't have enough of the samples, is my understanding of the record. Well, that's correct, Your Honor. But if there had been significant scratches in the midst of a life-and-death struggle, I think that it would be reasonable to assume that there would have been at least enough DNA evidence when these fingernails were dragged right after the event, that there would have been something. But certainly, while it doesn't preclude that there might have been something there, again, this was not evidence that was tied to Mr. Kestchen. It did not preclude him, but the state's obligation in a case where their evidence is entirely circumstantial is to preclude affirmatively that someone else could have committed this offense, and they did not do so. I'm going to ask you about Rule 431. In the record, it shows that he actually did, when he started to explain the jury, he explained by stating that there are four principles of law our system is based on and have to be confident, as do the party has to be confident, that you understand in our compliance with the law. So he actually did, at the beginning, make those statements, which are the ones you question, even though he used different language later on. And those languages can be correlative to what he said, at least I think. I'm familiar with that argument. The case log from the state court this issue requires that the jurors be given an opportunity to respond to the questions as to whether or not they understood. Well, the court may have said it sometime prior to asking the jurors whether they disagreed with or alternatively, and this is a separate group of jurors, by the way, had difficulty. None of the jurors were asked if they understood and accepted at a time that they had the opportunity to respond. And that's the key issue here. In this court, the first district has heard this argument that the state has raised previously and has rejected it as recently as last month in People v. Moore, 182535. So I would ask that this court certainly not substitute the court's obligation to affirmatively with the opportunity for jurors to answer, to respond to questioning for the court to ascertain that they both understand and accept each of them. Thank you. Any further questions? I'm good. All right. Thank you. All you may proceed. Thank you, Your Honor. May it please the court, counsel. The circumstantial evidence in this case was ample and more than sufficient to sustain the jury's verdict of guilty against Joseph Kestia, where they found that he choked the life out of his mother with his own hands. The evidence put him alone with the victim before, during, and after the crime. And timing is a huge element here. One of the findings or the finding of the EMTs when they arrived was that Ms. Kestian was in PEA, Pulseless Electrical Activity. What does that mean? It means that although her heart was not perfusing blood, her brain was still sending electrical signals to the heart telling it to operate. This can last only up until 30 minutes. Well, what happened in this case? We had Joseph Kestian saying he came downstairs. He discovers her. It may have been several minutes, as many as 10, before EMTs were called. We know that EMTs worked on Ms. Kestian at the home, that while they worked on her, police arrived, started conversing with Mr. Kestian. Mr. Kestian was then told to sit in the living room before they took Ms. Kestian out to the ambulance, and she passed in the ambulance. That means that the attack had to happen shortly, very shortly, before the EMTs arrived. And what do we know about that? We know that Mr. Kestian, he didn't get up because he claimed to hear a commotion, hear some intruder rummaging through the house. He found nothing in the house that suggested some intruder had been in there. There was nothing to shovel. He says a dresser was moved a couple inches from the wall, but a figurine on top of the dresser, he says, was placed gently on the floor. The $12 that was sitting on top of the dresser wasn't touched. The only thing that was supposedly missing was an heirloom ring, which would probably be of little value to anybody other than the victim in this case. So there's nothing. We did have affirmative evidence that the house was all locked up, buttoned up, and we even had the heat-resistant plastic on the windows. Everything about the circumstantial evidence said there was no way and no one other than Mr. Kestian had access to the house at the time of that murder. The question of the front door comes closest for defendant of raising some kind of issue, but even that is insufficient because what do we know from that? We know that he, on the 911 call, instead of following the 911 operator's instructions to go and check on Ms. Kestian, he keeps reiterating, I'm going to go to the door, I'm going to open that door for you, I'm going to open that door for you. The jury could easily, rationally conclude that his testimony showed that that door was locked, that he knew it was locked, because that's how the household ran. They had a routine. It was not irrational for a jury to conclude that that door was locked, that he knew it was locked, and that's why he said he was going to go and open the door. Or he was trying to create this impression that he was somehow concerned about his mother, whom he had just brutally beat and killed and choked the life out of. Then we have, as Justice Lavin pointed out, the issue of the markings on his body. Well, the evidence also showed that when Mr. Kestian made his way downstairs, he had on a t-shirt, shorts, and socks. When Mrs. Kestian, she tried to defend herself against him, and remember, many of the markings were in areas that would have been covered by his clothing. That would explain why there was not a lot of DNA, and would explain why you can still get marks underneath clothing, but you're not going to have transferred DNA in that circumstance. The fact that he had marks on his hands is probably indicative of that's why there was not a lot of DNA found under her nails. Or at least a rational jury can conclude that, yes, because she was a relatively frail 90-year-old woman, she would not be able to gouge and scratch and grab and defend herself like a much younger, stronger, active person would be. And so that would explain why, while there was some DNA, there was not a lot of DNA. What separates this case from the Dowaliby case, the Davis case cited in their brief, is a lot of it has to do with the timing issue. In Dowaliby, the body wasn't found until five days later. In Dowaliby, the body was found miles apart, not there in the presence of the defendant. In Dowaliby, there were three people in the home, one of whom the grandmother, whose whereabouts were wholly unaccounted for for several hours during the period when the young girl went missing. Davis, it was a similar thing. The defendant supposedly traveled across town to go and commit this. There was the timing, proximity. There was nothing to bolster the state's theory in that case of what occurred. Over here, on the other hand, you've got the circumstances all pointing in one direction. And that direction is Joseph Kestian, for all the reasons that we've talked about. You know, another thing we haven't touched on so far is the nature and extent of her injuries. One, they were quite severe and massive. She was injured throughout her entire body. Remember, the ME said her injuries were not consistent with CPR, were not consistent with a fall by an elderly person. That only leaves one basis for those injuries, and that's Joseph Kestian. Remember, Joseph Kestian wasn't reacting to some stimuli. He wasn't reacting to commotion, to the presence of something going on downstairs. I mean, Josephine was brutally beaten, and he just got up, casually brushed his teeth, walked out, and I thought I'd go check on her. This is not a situation that suggests that this murder on a residential street in Birtland was by—this isn't a Jason Bourne novel. There's no phantom intruder who came in here, like the defendant is trying to suggest, is borne out by the evidence. The evidence simply eliminates that possibility. Now, if we can turn now to the Rule 431B issue, as Justice Fitzgerald Smith pointed out, the court did preface the questioning of the jury with the obligatory language of understand and accept, and the jury knew full well what they were being asked when the questions were ultimately put to them. Plus, we are talking about four very fundamental, basic propositions that we all learned from a very young age support our criminal justice system. They are not difficult propositions for any of us to comprehend or for this jury veneer to comprehend. In fact, Justice Carmier, in his Sebi dissent, pointed out that these propositions indeed are so basic and fundamental and known, essentially, easy to understand by our people. The other issue is, even though the trial just may not have used the precise language of the rule, and maybe it would have been better had he done so during the actual questioning, the spirit and intent of the rule was carried out here in the manner in which he did ultimately question the jury. So on that basis, it would seem that because the spirit of the rule was indeed complied with, there would be no violation here sufficient to warrant a retrial. Finally, defendant raises the issue of sentencing. Here we have a man who was advanced years when he committed the crime. That was his choice to commit this crime at this point in his life. He should not benefit from that by getting a reduced sentence compared to someone who had committed a similar crime 10 years younger, 15 or 20 years younger. He certainly was old enough and wise enough to know that what he was doing was evil and that he could in fact face the rest of his life in prison for committing the act that he committed. And even so, we're only talking about a five-year increase from the minimum that the trial judge could have imposed in terms of a sentence. And it was certainly reasonable and within the trial court's discretion to impose this sentence given the nature of this crime and the beating that was inflicted on Josephine in connection with her death. For all these reasons, we ask that the first-degree murder conviction of Mr. Kestian be affirmed. Questions? No questions for me. How significant do you believe his conduct at the hospital was in terms of the circumstantial evidence in this matter? I think that's on the lower end of significance. I think the bigger issue is the timing. But I think the conduct at the hospital gives us some insight into Joseph Kestian's mindset at the time, gave the jury some insight into Mr. Kestian's mindset at the time this crime was committed. And adding that to the timing and the proximity and all the other issues, I think it was important, but it wasn't of key significance. Unlike Dwalaby, where I think more emphasis was put on the statements, and I think Dwalaby's statements were even more affrontery or incriminating than Mr. Kestian's. Mr. Kestian's statements really were more of a mindset of how he viewed and what he thought of Josephine Kestian. He really didn't think much of his meal ticket as he described her. Thank you. Stephen? All good. Steve, you may proceed. Thank you. The state this morning, unlike in its brief, highlights what they describe as timing. Mr. Kestian pointed out in the opening brief that the state failed to prove any evidence indicating what the duration of time would be between the attack that Mrs. Kestian suffered and when she lost her pulse. They did establish that there would have been a 30-minute period of time after the loss of a pulse where there would still be electrical activity in the body. In neither instance has the state shown that the timing precludes someone other than Joseph having committed this offense. The state is correct that in Dwalaby there was a larger window of time at issue. But I would point this court's attention to the case of People v. Howard, which was cited in Mr. Kestian's opening brief. In that case, the period of time was much smaller, much more similar to the instant case, possibly even a smaller window of time than the instant case. The defendant in that case said that she was in the shower at the time that the murder occurred. But in any event, while the state does point out the evidence related to pulse-less electrical activity that was brought out at trial, this evidence simply failed to preclude that someone else had committed this murder. Additionally, the idea that Mr. Kestian would not have heard this, he was living in an attic living space. According to his testimony, he'd fallen asleep after drinking some alcohol. The state presented no evidence that a very loud commotion would have attended the murder of this 90-year-old woman. Those arguments also failed on the state's part. The state's suggestion that the household ran in a manner that the front door would have been locked or was always locked, that's news to me. I don't recall seeing anything to that effect in the record. And then finally, as to the state's arguments with 431B, saying that these principles are not difficult to comprehend, they're not difficult for us to comprehend. We're attorneys. The jury in this case, however, not composed of attorneys, in fact, asked the judge for a definition of reasonable doubt during the deliberations. So, for these reasons, because the state's entirely circumstantial case failed to prove Joseph was the only person with the opportunity to commit this murder, and actually had no known motive to commit, we request this court reverse-outright his conviction or, in the alternative, demand for a new trial because of the court's failure to strictly comply as it is required with the mandates of Rule 431B. Questions? No. None? None. All right. Thank you very much. Your briefs were very well done and interesting, and the arguments were well done. I kind of enjoyed them. You've brought a little life to the case. Thank you. Thank you. Thank you, Your Honor. All right, we'll take it under advisement.